HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

CHARLES SHATEEK SMITH,

        Plaintiff,

        v.

BENJAMIN L. KELLY, et al.,

        Defendants.

CASE NO. C11-623RAJ

ORDER

## I.  INTRODUCTION

This matter comes before the court on the Report and Recommendation ("R&R") of the Honorable James P. Donohue, United States Magistrate Judge.  Both Plaintiff Charles Shateek Smith and Defendant Benjamin Kelly, an officer in the Seattle Police Department, object to portions of the R&R.   For the reasons stated below, the court ADOPTS much of the R&R (Dkt. # 91), DENIES Mr. Smith's objection (Dkt. # 92), DENIES Officer Kelly's objection (Dkt. # 93), and directs the parties to submit a joint statement regarding trial no later than November 7, 2013.

## II.  SUMMARY

Having ruled last May that Officer Kelly could not arrest Mr. Smith for the non-crime of jaywalking, the court rules today that he could not arrest him for the non-crime of jaywalking while making eye contact with a driver in traffic.  That ruling suffices to establish both that Officer Kelly violated the Fourth Amendment when he first arrested

ORDER – 1

Mr. Smith and violated it again when he searched Mr. Smith incident to that arrest. Because clearly established law prohibited the arrest and the search, the court's ruling also disposes of Officer Kelly's qualified immunity defense.  He is liable for violating Mr. Smith's Fourth Amendment rights; the only question remaining for trial is the amount of Mr. Smith's damages.

The damages question is complicated.  Officer Kelly's illegal search revealed that Mr. Smith was carrying a handgun, and a mobile criminal records check revealed that he was also a felon.  Mr. Smith never faced charges for any of his jaywalking offenses, he faced only state and federal charges arising from being a felon in possession of a handgun.  The court rules today that Mr. Smith may recover damages arising from his false arrest and unlawful search, but that he may not recover damages arising from his confinement after Officer Kelly discovered the handgun and his felony record.

In explaining these rulings, the court will attempt to avoid unduly repeating any of the four judicial opinions regarding Mr. Smith's arrest.  In the first, the Honorable John C. Coughenour suppressed evidence of the handgun, leading to the dismissal of a federal felon-in-possession charge against Mr. Smith.  *United States v. Smith*, No. CR09-161RAJ, 2009 U.S. Dist. LEXIS 132268 (W.D. Wash. Aug. 20, 2009).  After Mr. Smith sued Officer Kelly and others on many grounds, Judge Donohue issued an R&R concluding that this court should narrow the suit to a claim against Officer Kelly for violating the Fourth Amendment.  *Smith v. Kelly*, 2012 U.S. Dist. LEXIS 64586 (W.D. Wash. Feb. 21, 2012).  This court adopted that R&R, referring the matter back to Judge Donohue for pretrial proceedings.  *Smith v. Kelly*, 2012 U.S. Dist LEXIS 64584 (W.D. Wash. May 8, 2012).  Mr. Smith obtained pro bono counsel, and the parties completed discovery and filed cross-motions for summary judgment.  Judge Donohue's second R&R followed.

ORDER – 2

Judge Donohue urges to court to find that when Officer Kelly first arrested Mr. Smith, he lacked probable cause to believe he had committed any crime and thus had no authority to search Mr. Smith.  Judge Donohue also concludes that Officer Kelly's unlawful arrest and search violated clearly established law, a conclusion that would spell doom for Officer Kelly's qualified immunity defense.  The court adopts those conclusions, but elaborates on the conclusion that Officer Kelly lacked probable cause to arrest Mr. Smith for the crime of pedestrian interference.

As to damages, Judge Donohue recommends that the court conclude that Mr. Smith may not recover damages arising from his confinement after a state prosecutor filed a firearm-possession charge in King County Superior Court on February 4, 2009, just five days after Mr. Smith's arrest.  The court cannot adopt that recommendation. Instead, the court concludes that Mr. Smith may recover only damages resulting from his initial arrest and search.  As a matter of law, those do not include damages resulting from his confinement and prosecution after Officer Kelly discovered the handgun and Mr. Smith's felony record.

For an R&R arising out of a dispositive motion, the court conducts de novo review of any portion of the R&R to which a party properly objects.  Fed. R. Civ. P. 72(b)(3).  In this case, that means applying the familiar summary judgment standard, which requires the court to draw all inferences from the admissible evidence in the light most favorable to the non-moving party.  *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).  Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(a). The moving party must initially show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The opposing party must then show a genuine issue of fact for trial.  *Matsushita Elect. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The opposing party must present probative evidence to support its

ORDER – 3

claim or defense. *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991). The court defers to neither party in resolving purely legal questions. *See Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999).

### III.   OFFICER KELLY'S VIOLATION OF THE FOURTH AMENDMENT

This suit arises from Mr. Smith's walk across Rainier Avenue, an arterial street in Seattle. That walk took, at most, 20 seconds. Officer Kelly arrested Mr. Smith within 10 seconds after it concluded. Officer Kelly contends that what he observed in those 30 seconds gave him probable cause to arrest Mr. Smith for a crime. The court thus considers what a reasonable officer in Officer Kelly's position would have observed, taking all reasonable inferences in his favor. Ultimately, the court will determine if those observations added up to probable cause, *i.e.*, a determination that "the facts and circumstances within [Officer Kelly's] knowledge [were] sufficient for a reasonably prudent person to believe" that Mr. Smith committed a crime. *Rosenbaum v. Washoe County*, 663 F.3d 1071, 1076 (9th Cir. 2011).

### A.   Mr. Smith's Walk Across Rainier Avenue, In the Light Most Favorable to Officer Kelly

The court has reviewed the video of the incident from Officer Kelly's patrol-car-mounted camera. It suffices to demonstrate almost all of the facts material to his decision to arrest. Officer Kelly and Mr. Smith offer their own versions of those facts. With a few exceptions, the video frees the court from relying on either party's version. Even on summary judgment, a court may rely on a video where no reasonable jury could credit a party's version of events in lieu of the video. *Scott v. Harris*, 550 U.S. 372, 380-81 (2007). Although Officer Kelly's video does not reveal every aspect of Mr. Smith's walk across the street, it puts the facts that are material to this order beyond dispute.

Officer Kelly was driving his patrol car northbound on Rainier Avenue, an arterial street. It was about 9:15 on a rainy January night. Officer Kelly could see a signal-controlled intersection as he approached it. Traffic around the intersection was brisk, but

ORDER – 4

there were frequent gaps in traffic as a result of the signal.  At the south end of the
intersection, Rainier Avenue consists of two northbound lanes, a northbound left-turn
lane, and a single southbound lane with a shoulder wide enough to accommodate parked
vehicles.  Approximately eight car lengths south of the intersection, there is a bus stop on
the west side of Rainier Avenue.

As Officer Kelly approached the intersection from the south, a group of people
numbering at least seven began crossing Rainier Avenue from the east to the west in the
direction of the bus stop the court just mentioned.  At the time, traffic on Rainier Avenue
had the green light.  Some of the jaywalkers were running, some more quickly than
others.  A northbound car in front of Officer Kelly slowed and ultimately stopped to let
the jaywalkers pass.  Mr. Smith was one of the jaywalkers, but he moved more slowly
than others.  He was not running.  By the time he neared the border of the northbound
left-turn lane and the southbound lane, only he and another jaywalker remained in the
street.  The other jaywalkers had reached the bus stop, where they waited.  The other
remaining jaywalker was moving more quickly than Mr. Smith, but he had started his
dash across the street later.  He reached the position just to the east of the border of the
northbound left-turn lane and the southbound lane at about the same time as Mr. Smith.
By that time, a southbound car had passed through the intersection and had approached
close to both jaywalkers.  That vehicle had already slowed somewhat as the first
jaywalkers crossed, but it slowed more as it approached Mr. Smith and the other
remaining jaywalker.  Mr. Smith slowed his pace at this point, as did the other jaywalker.
At the time they slowed, they had yet to enter the path of the southbound car.  Although
the video does not reveal precisely where Mr. Smith and the other jaywalker were
looking, it is possible that they were looking at the driver of the southbound car, and the
court must assume they did for purposes of this order.  It is possible that they both
stopped moving, but only for an instant.  In that instant, the southbound car slowed to a

ORDER – 5

stop, and both jaywalkers continued west, with the other jaywalker again moving more quickly than Mr. Smith.  Mr. Smith resumed his previous walking pace, and was clear of the path of the southbound car in no more than three seconds.  Mr. Smith may have maintained eye contact with the driver from the moment he first slowed or stopped until he finished his crossing, and the court assumes he did for purposes of this order.

Officer Kelly began to turn his car into the turn lane even before Mr. Smith and the other jaywalker reached the point at which they slowed or stopped.  After Mr. Smith had moved beyond the path of the southbound car (but not quite to the west curb), Officer Kelly swerved sharply into the southbound lane (in front of the car that had stopped for Mr. Smith and the other jaywalker) and stopped at the west curb adjacent to the bus stop where the jaywalkers had congregated.  He stopped his car two seconds after Mr. Smith reached the curb.  From that point on, Mr. Smith is not visible in the video.

The audio track of the video, however, puts some aspects of Mr. Smith's interaction with Officer Kelly beyond dispute.  For technological reasons that Officer Kelly explained when he testified at the suppression hearing, there is no audio for the first minute and five seconds of the video.  When the audio begins, two or three seconds after Mr. Smith reaches the curb, Officer Kelly is saying "come here."  He closed his car door just as he finished those words.  Within three seconds after he said "come here," he began cursing at Mr. Smith.  His words strongly suggest that Officer Kelly seized Mr. Smith at about the time he began cursing.  The video reveals partial images of Mr. Smith being held against the hood of Officer Kelly's car, images that begin ten seconds after Officer Kelly said "come here."  Officer Kelly, upon viewing the video, testified that he seized Mr. Smith within about three seconds of his initial command to "come here."

Officer David Ellithorpe also witnessed Mr. Smith's crossing from his vantage point in his patrol car in a parking lot on the west side of Rainier Avenue.  He was south and west of Mr. Smith.  He had no vantage point that would have permitted him to

ORDER – 6

observe anything more about Mr. Smith's crossing than the video reveals. He joined

Officer Kelly at some point after he had seized Mr. Smith.

A search incident to the arrest quickly uncovered a .22-caliber handgun. About 40

seconds after Officer Kelly said "come here," he asked "what do you got on you tonight,

there, Mr. Smith?" The court assumes that Officer Kelly's search of Mr. Smith began no

later than that moment. About a minute and a half after Officer Kelly said "come here,"

he asked "why are you walking around with a [inaudible] gun in your pocket?" The court

assumes the officers had seized the firearm by that point. No evidence suggests

otherwise. An in-car computer search revealed that Mr. Smith was a felon.

**B.    Officer Kelly's Unlawful Arrest and Search**

Officer Kelly has offered numerous justifications for his search. Judge

Coughenour rejected the federal government's contention that he had a reasonable

suspicion that Mr. Smith was armed, and thus ruled that Officer Kelly could not conduct

the limited pat-down search that *Terry v. Ohio*, 392 U.S. 1 (1968), authorizes. *Smith*,

2009 U.S. Dist. LEXIS 132268, at *12-14. Officer Kelly has wisely refrained from

raising that contention again in these summary judgment motions. He now argues only

that the search was permissible because it was incident to a lawful arrest.[1] In its previous

order, this court rejected his assertion that he could have arrested Mr. Smith for the non-

crime of jaywalking. Now, he contends he had probable cause to arrest Mr. Smith for

two crimes: pedestrian interference and obstructing a law enforcement officer. As to

obstruction, the court need not elaborate on the R&R's vitiation of the notion that Mr.

Smith committed a crime by not responding in three seconds or fewer when Officer Kelly

said "come here." The court adopts the R&R's conclusion that no reasonable officer

---

[1] Judge Coughenour rejected the search-incident-to-arrest rationale when he suppressed evidence
in the criminal case. *Smith*, 2009 U.S. Dist. LEXIS 132268, at *5-12. The court adopts the
R&R's conclusion that the suppression rulings are not binding in this civil case.

ORDER – 7

could have believed that Mr. Smith obstructed the officers, and that Officer Kelly is not entitled to qualified immunity.

The court now elaborates on the R&R's conclusion that Officer Kelly lacked probable cause to arrest Mr. Smith for pedestrian interference.

### 1.    Mr. Smith Lacked the Intent Necessary for Pedestrian Interference.

The Seattle ordinance that makes pedestrian interference a misdemeanor requires a person to "intentionally . . . [o]bstruct pedestrian or vehicular traffic."  Seattle Mun. Code ("SMC") 12A.12.015(B).  It explains that to obstruct vehicular traffic is to "walk, stand, sit, lie, or place an object in such a manner as to block passage by . . . a vehicle, or to require . . . a driver of a vehicle to take evasive action to avoid physical contact."  SMC 12A.12.015(A)(4).  The ordinance models the portion of Washington's disorderly conduct statute that criminalizes "[i]ntentionally obstruct[ing] vehicular or pedestrian traffic without lawful authority . . . ."  RCW 9A.84.030(1)(c).

"Intent" and "intentionally" are terms of art in the codification of crimes.  Both Washington and Seattle law declare that a "person acts with intent or intentionally when he or she acts with the objective or purpose to accomplish a result which constitutes a crime."  SMC 12A.04.030(A); RCW 9A.08.010(1)(a).  "Intent" is distinct from "knowledge," which merely requires that a person be "aware of a fact, facts, or circumstances or result described by a statute defining an offense . . . ." SMC 12A.04.030(B)(1); RCW 9A.08.020(1)(b)(i).

With these statutory definitions in mind, the court considers the typical jaywalker. She crosses the street not with the objective or purpose of hindering traffic, but with the objective or purpose of crossing the street.  If there is traffic nearby, she likely knows (indeed, she may know for certain) that her crossing will hinder it, but that is not her objective.  Although reasonable practitioners of the English language might question whether a person who walks into traffic knowing she will hinder it "intends" to hinder

ORDER – 8

traffic, courts and legislatures have put that question to rest in the context of criminal law. "'Intent' to commit a criminal act means more than merely 'knowledge' that a consequence will result." *State v. Bea*, 254 P.3d 948, 952 (Wash. Ct. App. 2011); *see also State v. Caliguri*, 664 P.2d 466, 469 (Wash. 1983) ("'Intent' to kill . . . means more than merely 'knowledge' that death will result.'"). "'Intent' exists only if a known or expected result is also the actor's 'objective or purpose.'" *Bea*, 254 P.3d at 952 (quoting *Caliguri*, 664 P.2d at 469). The typical jaywalker, in short, lacks the intent necessary for pedestrian interference. It is the rare pedestrian who steps into traffic with the purpose of obstructing it, rather than moving to a destination. There are, to be sure, pedestrians who intentionally obstruct traffic. For example, the court in *State v. Greene* concluded that officers had probable cause to arrest for pedestrian interference after a suspect stood on a sidewalk, "looked in the direction of [police] officers" driving an oncoming patrol car, "then stepped into the roadway right into the path" of the patrol car, causing the officers to swerve into another lane. 983 P.2d 1190, 1191 (Wash. Ct. App. 1999); *see also id.* at 1193 (noting officer's testimony that defendant was "looking directly at us" when he stepped into the road, concluding that officers had probable cause). There was no indication that the defendant in *Greene* was attempting to cross the street.

The court now considers Mr. Smith. No reasonable person could argue that he began his journey across Rainier Avenue as anything other than a typical jaywalker. He was part of a pack of jaywalkers, and the quickest among them had already demonstrated to Officer Kelly that their destination was the bus stop on the west curb. Mr. Smith moved more slowly than his fellow jaywalkers, but well within a normal walking pace. Officer Kelly makes much of Mr. Smith's slowing or stopping before stepping in to the southbound lane of traffic, including his alleged "stare down" of the driver of that vehicle. As the court has noted, the summary judgment standard compels it to conclude that Mr. Smith looked at the driver of the southbound car as he stopped or slowed, and

ORDER – 9

continued to do so as he resumed his walking pace and finished his crossing. If he stopped moving at all, he did so only momentarily. Moreover, he stopped or slowed while he was still clear of the path of the southbound car. Why anyone would interpret Mr. Smith's conduct as a "stare down" as opposed to an effort to ascertain whether the car would continue to slow is a question Officer Kelly does not answer. Regardless, the law requires no answer to that question. Instead, it requires an answer to this question: what about the circumstances of Mr. Smith's encounter with the southbound car would have warranted the conclusion that in addition to the "purpose" to cross the street, Mr. Smith had the "purpose" to obstruct traffic?[2] Mr. Smith's momentary "stare down," even if it occurred, suggests at most the knowledge that a look at the driver might cause that driver to slow or stop to allow Mr. Smith to complete his journey. If Mr. Smith's *purpose* was to obstruct traffic, why would he continue his journey across the street, completing his crossing three seconds or fewer after slowing or stopping for an instant? The evidence, taken in the light most favorable to Officer Kelly and taking all inferences in his favor, permits only one reasonable conclusion: Mr. Smith was no different than the typical jaywalker. He was aware that his conduct would likely obstruct traffic, but that was not his purpose.

Officer Kelly attempts to take refuge in a legal presumption that permits him, in appropriate circumstances, to infer intent from mere knowledge. He points out that a person may infer intent from knowledge, because a person "may infer that a defendant intends the natural and probable consequences of his or her acts." *Caliguri*, 664 P.2d at

---

[2] Officer Kelly objects to a single sentence in the R&R stating that pedestrian interference requires the "blocking of traffic to be the defendant's *primary* purpose or goal, rather than the consequence of another objective." R&R at 32 (emphasis added). To the extent that sentence implies that a pedestrian with the purpose of obstructing traffic has not committed a crime unless it was her primary purpose, it misstates the law. A pedestrian commits interference if her purpose was to obstruct traffic, even if she had an additional "primary" purpose. If, for example, Mr. Smith had stopped in front of the southbound car, stared at the driver, and remained motionless for five seconds, a reasonable officer might believe that he intended to obstruct traffic in addition to intending to cross the street.

ORDER – 10

506.  The court will assume that obstructing traffic is a natural and probable consequence of Mr. Smith's behavior.  Indeed, at least two cars slowed or stopped because of Mr. Smith and his fellow jaywalkers.  The inference of intent from Mr. Smith's knowledge of those consequences is permissive, not mandatory.  Just as it is "constitutional error for a court to instruct a jury that the law presumes that a person intends the ordinary consequences of his voluntary acts," *Bea*, 254 P.3d at 953, it would be error to presume automatically that Mr. Smith intended to obstruct traffic.  *See Bea*, 254 P.3d at 955 (noting that "the difference between a legitimate inference or permissive presumption and an unconstitutional conclusive presumption" was a matter of "well-settled law").  Officer Kelly's obligation was to decide whether he could infer that Mr. Smith's intended to obstruct traffic "as a logical probability from all the facts and circumstances."  *Id.* (quoting *State v. Wilson*, 993 P.2d 320, (Wash. 1994)).  In this case, no reasonable person could conclude based on Mr. Smith's momentary slowing or stopping, his eye contact with the driver of the southbound car, and all other circumstances, that he had any objective or purpose other than crossing the street.  He had, at most, knowledge that his conduct would obstruct traffic; he lacked intent as a matter of law.

## 2.    Officer Kelly is Not Entitled to Qualified Immunity.

Police officers sued in their individual capacities for violating 42 U.S.C. § 1983 can invoke the defense of qualified immunity.  Qualified immunity shields a police officer whose conduct does not violate "clearly established" law.  *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  In the context of an arrest for which there is no probable cause, an officer is entitled to qualified immunity if reasonable officers in his position could disagree as to the legality of the arrest.  *Rosenbaum*, 663 F.3d at 1076; *Acosta v. City of Costa Mesa*, 718 F.3d 800, 825 n.14 (9th Cir. 2012) ("An officer is entitled to immunity where a

ORDER – 11

reasonable officer would believe that probable cause existed, even if that determination was a mistake.").

The court concludes that no reasonable officer could have believed that Mr. Smith had committed pedestrian interference. Other than Officer Kelly's assertion that Mr. Smith "stared down" the driver of the southbound vehicle as he momentarily slowed or stopped and then finished his walk across the street (an assertion that the court has credited for purposes of these motions), the video puts to rest any factual disputes relevant to Mr. Smith's crossing of Rainier Avenue. Reasonable officers could disagree about the legality of the arrest only if they could reasonably disagree about the legal distinction between pedestrian interference and common jaywalking. Where the law is clearly established, however, reasonable officers are ordinarily deemed to know it. *Harlow v. Fitzgerald*, 457 U.S. 800, 818-19 (1982) (permitting qualified immunity only if defendant "can prove that he neither knew nor should have known of the relevant legal standard"). Washington's legislature codified the difference between "intent" and lesser degrees of culpability when it enacted RCW 9A.08.020 in 1975, and Seattle made the same distinctions in SMC 12A.04.030, an ordinance it last amended in 1991. Both Seattle's pedestrian interference ordinance and its state equivalent unambiguously require an intent to obstruct traffic. If there is any case in which an ordinary jaywalker was held to have committed the crime of pedestrian interference, the court is not aware of it. Mr. Smith bears little resemblance to the guilty defendant in *Greene*, who leapt in front of a police car for no discernible reason but to impede it. Even if *Greene* and the plain language of the statutes and ordinances it interprets were insufficient, Washington's Supreme Court held more than two decades ago that it is the requirement of intent that saves Seattle's pedestrian interference statute from violating the Constitution. *City of Seattle v. Webster*, 802 P.2d 1333, 1339 (Wash. 1990) (concluding that ordinance did not run afoul of First Amendment overbreadth doctrine); *id.* at 1340 (concluding that

ORDER – 12

ordinance was not so vague as to violate the Due Process Clause of the Fourteenth Amendment).  Any reasonable officer was on notice that intent (not mere knowledge) was a critical element of the offense.

There is another reason that reasonable officers aware of clearly established law could not disagree about whether Mr. Smith's conduct was criminal: both Washington and Seattle law prohibit the criminalization of jaywalking.  That issue was central to the court's ruling last year that Officer Kelly could not arrest Mr. Smith for jaywalking.  *See Smith*, 2012 U.S. Dist. LEXIS 64584, at *4-5.  If Seattle's pedestrian interference statute criminalizes jaywalking, it violates state law.  *Greene*, 983 P.2d at 1192 (explaining the "uniformity requirement of RCW 46.08.020," which declares municipal traffic laws that conflict with state law "to be invalid and of no effect").  Even if Officer Kelly could ignore the plain meaning of the pedestrian interference ordinance, clearly established law put him on notice that the ordinance prohibited only conduct "more egregious than jaywalking," *Greene*, 983 P.2d at 1192, specifically by criminalizing conduct outside the scope of Washington's (and Seattle's) many non-criminal jaywalking laws.  Among those laws, for example, is a mandate that "every pedestrian crossing a roadway at a point other than at designated crosswalks . . . shall yield the right-of-way to all vehicles upon the roadway."  SMC 11.40.090; RCW 46.61.240(1).  Violation of that mandate "is designated as a traffic infraction and may not be classified as a criminal offense."  SMC 11.31.010; RCW 46.63.020.  The question confronting Officer Kelly was thus whether Mr. Smith had done something more egregious than failing to yield the right-of-way.  If "staring down" an oncoming vehicle after slowing or stopping for a moment before finishing a crossing three seconds later is enough to transform jaywalking into pedestrian interference, then any jaywalker with the sense to look at approaching traffic and proceed cautiously is a criminal.  Clearly established law prohibits that result.  *See Smith*, 2012

ORDER – 13

U.S. Dist. LEXIS 64584, at *15-16 (concluding that Washington's decriminalization of jaywalking is clearly established law).

## IV.   MR. SMITH'S DAMAGES

Having established that Officer Kelly is liable for violating the Fourth Amendment, it remains for Mr. Smith to prove damages.  Mr. Smith believes he is entitled to compensation not merely for his unlawful arrest and search, but for all of the consequences, including the approximately five months that he was jailed between his arrest and the dismissal of charges against him following Judge Coughenour's suppression ruling.  Those damages include, in Mr. Smith's view, lost wages, child care expenses, and the cost of posting bail to release him from state custody.

The court rejects Mr. Smith's preferred approach, which is to treat his initial arrest, search, and subsequent confinement as an unbroken chain of consequences resulting from Officer Kelly's unlawful conduct.  Although he does not explicitly admit it, he cannot contest that the firearm and felony record that Officer Kelly discovered gave probable cause to arrest him on state firearm-possession charges, and gave the state (and later the federal government) a lawful basis to confine him before trial.  He insists instead that the court should exclude the discovery of the gun as evidence, which amounts to an application of the exclusionary rule.  The overwhelming majority of courts (if not all of them) who have confronted a similar claim conclude that the exclusionary rule does not apply in a § 1983 claim.  After reviewing that precedent, along with Ninth Circuit precedent on the civil application of the exclusionary rule, the court concludes that the exclusionary rule does not apply in this case.  Once Officer Kelly seized the firearm and discovered Mr. Smith's felony record, he had probable cause to lawfully continue his initially unlawful arrest of Mr. Smith.  A false arrest claim requires the plaintiff to prove a lack of probable cause.  *Norse v. City of Santa Cruz*, 629 F.3d 966, 978 (9th Cir. 2010); *Cabrera v. City of Huntington Park*, 159 F.3d 374, 380 (9th Cir. 1998).  Mr. Smith

ORDER – 14

cannot prove that the continuation of his arrest after Officer Kelly discovered the handgun and his felony record was without probable cause.[3]

Although he cannot avoid a finding that Officer Kelly had probable cause to arrest him on the firearm charge, he can still recover damages accruing after that arrest if Officer Kelly's initial violations of the Fourth Amendment were the lawful cause of those damages. The R&R correctly concludes that once the King County Prosecutor charged Mr. Smith with unlawful possession of a firearm (five days after his arrest), Officer Kelly's illegal conduct was no longer the cause of Mr. Smith's confinement and its consequences. Tort principles applicable to § 1983 claims, along with considerations unique to § 1983, dictate that result. The same principles, however, dictate that Officer Kelly is not legally responsible for Mr. Smith's confinement from the moment he discovered the firearm and Mr. Smith's felony record.

The court now elaborates on both its decision not to apply the exclusionary rule and the causation principles that govern this § 1983 claim.

**A.     The Exclusionary Rule Does Not Apply in This Case.**

The exclusionary rule and the closely-related "fruit of the poisonous tree" doctrine are time-tested fixtures of *criminal* law.[4] The exclusionary rule prohibits (subject to a number of exceptions) the use of unlawfully-acquired evidence to prove a defendant

---

[3] Officer Kelly arrested Mr. Smith for pedestrian interference, but that is not dispositive. An officer may arrest if he has probable cause to believe that any crime was committed in his presence, it need not be the crime he was actually considering at the time of the arrest. *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004).

[4] The court today discusses only the exclusionary rule arising from the Fourth Amendment, as first applied to the federal actors in *Weeks v. United States*, 232 U.S. 383, (1914) and applied to state actors in *Mapp v. Ohio*, 367 U.S. 643, 655 (1961). That rule prohibits the use of evidence acquired in a search that violates the Fourth Amendment. A corollary to the exclusionary rule, the fruit of the poisonous tree doctrine, takes its name from colorful language in *Nardone v. United States*, 308 U.S. 338, 341 (1939). It prohibits not merely the use of evidence obtained directly from a violation of the Fourth Amendment, but the use of evidence that indirectly results from a violation. *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963). Evidence acquired in a way that "purge[s] [it] of the primary taint" is, however, admissible. *Id.* (citation omitted). Except where clarity demands, the court will refer to both doctrines collectively as the exclusionary rule.

ORDER – 15

guilty of a crime.  Mr. Smith can personally attest to the impact of the rule; it was Judge Coughenour's application of it that led federal prosecutors to dismiss the charges against him.  But courts rarely apply the exclusionary rule in civil contexts.  The Constitution does not compel them to, because the exclusionary rule is not a "necessary corollary of the Fourth Amendment," it is a "judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved."  *United States v. Leon*, 468 U.S. 897, 905-06 (1984) (second quotation from *United States v. Calandra*, 414 U.S. 338, 354 (1974)).  Application of the exclusionary rule comes with "substantial social costs," including the possibility that guilty defendants will go unpunished.  *Leon*, 468 U.S. at 907-08.  The Supreme Court has thus never applied it universally.

### 1.  Courts Have Uniformly Rejected Application of the Exclusionary Rule in § 1983 Cases.

The Ninth Circuit has generally declined to apply the exclusionary rule in civil cases.  The court will consider Ninth Circuit jurisprudence in more detail later.  For now, it observes that the Ninth Circuit has never directly addressed the question critical to this case: whether the exclusionary rule applies in § 1983 litigation.  Every circuit court to consider the issue has declined to apply the rule.  *Wren v. Towe*, 130 F.3d 1154, 1158 (5th Cir. 1997); *Townes v. City of New York*, 176 F.3d 138, 145 (2d Cir. 1999) ("We find no case in which the [fruit of the poisonous tree] doctrine has been successfully invoked to support a § 1983 claim, and we see no reason why it should be."); *Hector v. Watt*, 235 F.3d 154, 158-60 (3d Cir. 2000).  The court predicts that the Ninth Circuit would not be the first court to rule otherwise.  To explain that prediction, the court begins its extended review of the Second Circuit's decision in *Townes*.

### a.  *Townes v. City of New York*

The *Townes* court considered a plaintiff, much like Mr. Smith, who police had unlawfully searched and arrested.  An unlawful search of the taxicab in which the

ORDER – 16

plaintiff was a passenger yielded handguns, which in turn led to the plaintiff's arrest and a search incident to the arrest that yielded cocaine. *Id.* at 141. Unlike Mr. Smith, the plaintiff was unable to convince the trial judge in his criminal case to suppress the evidence, leading to the plaintiff's guilty plea to weapons and drug charges and two years of incarceration. *Id.* at 142. On appeal, a New York state court held the initial search unlawful and excluded the evidence that police had seized, leading the state to dismiss the indictment and release the plaintiff. *Id.* When the plaintiff filed his § 1983 suit, he did not ask for damages for the invasions of privacy inherent in his unlawful search, "but rather for injuries derivative of these invasions – his arrest, conviction, and incarceration." *Id.* at 141. The court explained that the plaintiff, like any § 1983 plaintiff, was entitled only to damages for injuries caused by the violation of his constitutional rights. *Id.* at 145. It then explained why neither the "fruit of the poisonous tree doctrine" nor "traditional common law tort principles of causation" were sufficient to link the constitutional violations to the confinement-based injuries the plaintiff claimed. *Id.*

The *Townes* court concluded that the exclusionary rule does not apply to § 1983 actions, 176 F.3d at 145, a holding that found its root in a long line of Supreme Court authority limiting the application of the exclusionary rule to criminal trials. In many cases, the Supreme Court has recognized that application of the exclusionary rule in criminal cases is sufficient to deter law enforcement officers from violating the Constitution. *See*, *e.g.*, *Leon*, 468 U.S. at 910-13 (citing cases). Although applying the rule in other circumstances would perhaps increase its deterrent effect, the Court has frequently found that any incremental increase in deterrence is outweighed by the social costs of expanding the application of the rule. Circumstances in which the Court has declined to apply the rule are legion: it does not prevent prosecutors from relying on unlawfully obtained evidence in grand jury proceedings, *Calandra*, 414 U.S. at 351; it

ORDER – 17

does not prevent the use of unlawfully acquired evidence to impeach a defendant, *Walder v. United States*, 347 U.S. 62 (1954); it does not prevent the use of unlawfully acquired evidence against a defendant in a petition for a writ of habeas corpus, provided the defendant had an opportunity to articulate his Fourth Amendment argument in state court, *Stone v. Powell*, 428 U.S. 465 (1976); it does not apply in parole revocation hearings, *Penn. Bd. of Probation & Parole v. Scott*, 524 U.S. 357 (1998); and it does not apply even in criminal cases to evidence that would have inevitably have been discovered lawfully, *Nix v. Williams*, 467 U.S. 431 (1984).  More applicable to this case are decisions refusing to apply the exclusionary rule in a variety of civil contexts.  It does not apply in civil deportation hearings.  *I.N.S. v. Lopez-Mendoza*, 468 U.S. 1032 (1984).  It does not prevent the federal government from using evidence unlawfully seized by state agents in civil tax proceedings.  *United States v. Janis*, 428 U.S. 433 (1976).

Considering the foregoing authority, the *Townes* court explained that the state appellate court ruling excluding the fruit of the unlawful searches had already achieved the "deterrence objective" of the exclusionary rule.  176 F.3d at 146.  It concluded that allowing § 1983 cases to "proceed solely on a fruit of the poisonous tree theory of damages would vastly overdeter state actors . . . ."  *Id.*

The *Townes* court also concluded that the fruit of the poisonous tree doctrine incorporates a view of causality that is broader than the tort law causation principles that § 1983 generally incorporates.  176 F.3d at 146; *see also Cary v. Piphus*, 435 U.S. 247, 257-58 (1980) (common law tort principles of compensation "provide the appropriate starting point" in determining § 1983 compensation principles); *Arnold v. IBM Corp.*, 637 F.2d 1350, 1355 (9th Cir. 1981) (incorporating tort causation principles, including "proximate or legal causation" in § 1983 cases).  The exclusionary rule, by contrast, "disregards traditional causation analysis to serve different objectives."  *Townes*, 176 F.3d at 146.  Exclusionary rule considerations, like whether a constitutional violation

ORDER – 18

taints the challenged evidence, differ from the proximate cause analysis that applies in tort cases.  *Id.*  The court will return to § 1983 causation principles, both those that derive from tort law and those that derive from the nature of the statute, in Part III.B, *infra*.

The *Townes* court ruled that even though the police had illegally seized the evidence that gave them probable cause to arrest, the exclusionary rule prevented neither the police nor the court from ruling that the arrest was lawful.  176 F.3d at149 ("The lack of probable cause to stop and search does not vitiate the probable cause to arrest, because (among other reasons) the fruit of the poisonous tree doctrine is not available to assist a § 1983 claimant.").

### b.    *Hector v. Watt*

The Third Circuit reached the same conclusion in *Hector*, an opinion that follows *Townes* and amplifies its conclusions.  235 F.3d at 158-60.  The plaintiff in *Hector* claimed damages arising from expenses relating to his prosecution for a drug offense, a prosecution that ended after the trial court suppressed illegally seized evidence.  *Id.* at 155.  The court acknowledged that "imposing substantial financial liability on officers would add measurably to the deterrent effect of the exclusionary rule," and acknowledged that the rule's impact on the "truth-seeking function of trials" was not a convincing justification against its application.  *Id.* at 159.  What ultimately persuaded the *Hector* court against application of the exclusionary rule is that it would impose liability without regard to the seriousness of the Fourth Amendment violation.  It explained that an officer who committed a relatively modest violation of the Fourth Amendment (like, for example, an officer conducting a "lawful frisk" who opened "a small package, like a wallet, when there was insufficient justification for doing so") but uncovered "evidence of massive criminal wrongdoing" would face substantial liability for a "minimal intrusion into privacy."  *Id.*  By contrast, an officer who egregiously violated the Fourth Amendment (by, for example, "barg[ing] into someone's house without a warrant" and

ORDER – 19

"ransack[ing] all the rooms") without unearthing evidence of a crime would face relatively minor liability. *Id.* In the *Hector* court's view, in light of the "social importance of police enforcement, . . . it is irresponsible to impose potential liability out of proportion to the errors committed." *Id.* at 160.

### c.   *Wren v. Towe*

In *Wren*, the Fifth Circuit considered a § 1983 claim from two plaintiffs whose truck was seized after police found probable cause to believe it was the product of an illegal "chop shop." 130 F.3d at 1156. Police found the evidence supporting probable cause in an illegal search of the truck. *Id.* at 1158. The court refused to exclude the evidence, ruling after a brief discussion that neither the "deterrent rationale" nor precedent supported application of the exclusionary rule. *Id.*

The R&R distinguishes *Wren* because it acknowledged prior Fifth Circuit precedent expressing "grave reservations about whether, as a matter of law, police officers who illegally obtain evidence may use that evidence to establish a good-faith defense to a Section § 1983 action." 130 F.3d at 1158 n.6 (quoting *Jonas v. City of Atlanta*, 647 F.2d 580, 588 n.12 (5th Cir. 1981)). The distinction is not persuasive for two reasons. First, the *Wren* court was unpersuaded by the *Jonas* court's "reservations," noting that they were neither "binding" nor applicable to the circumstances before it. 130 F.3d at 1158 n.6. The *Jonas* court, moreover, had no quarrel with refusing to apply the exclusionary rule to the benefit of a plaintiff seeking § 1983 damages. 647 F.2d at 586-87 (refusing to exclude contraband discovered in unlawful searches). The "good-faith" defense to which the *Jonas* court referred in dicta was a qualified immunity defense arising from an erroneous but reasonable conclusion that probable cause existed. 647 F.2d at 588 n.12 (referring to cases cited at 586 n.9). The court's reservations about the use of illegally seized evidence to support that defense has no obvious bearing on its use by a plaintiff to support a claim for damages.

ORDER – 20

1

#### d.       Dozens of District Courts

2       Both before and after *Townes*, *Hector*, and *Wren*, a long roster of district courts,

3  including many in the Ninth Circuit, have declined to apply the exclusionary rule to

4  plaintiffs in Mr. Smith's position.  *E.g.*, *Lindsey v. Wyatt*, No. 02:10-cv-1437HZ, 2013

5  U.S. Dist. LEXIS 74353, at *(D. Ore. May 27, 2013) ("[A]ll of the evidence seized from

6  Plaintiffs' residence is admissible to determine whether Defendants had probable cause to

7  arrest even if the seizure of that evidence was caused by an illegal search."); *Elkins v.*

8  *District of Columbia*, 610 F. Supp. 2d 52, 61 n.7 (D.D.C. 2009) ("The fruit of the

9  poisonous tree doctrine does not apply to § 1983 cases."), *aff'd in part, rev'd on other*

10  *grounds*, 690 F.3d 554 (D.C. Cir. 2012); *Willis v. Mullins*, 809 F. Supp. 2d 1227, 1234-35

11  (E.D. Cal. 2011) (declining to exclude evidence lawfully obtained after unlawful entry);

12  *Bernardi v. Klein*, 682 F. Supp. 2d 894, 901-02 (W.D. Wis. 2010) (declining to exclude

13  evidence obtained from sobriety tests after unlawful traffic stop); *Radwan v. County of*

14  *Orange*, No. SACT 08-786 AG, 2010 U.S. Dist. LEXIS 85132, at *20-30 (C.D. Cal.

15  Aug. 18, 2010) (rejecting argument that fruit of unlawful search of plaintiff could not be

16  used to justify later search of plaintiff's car); *Davis v. United States*, No. EDCV 07-

17  481VAP, 2010 U.S. Dist. LEXIS 7036, at *63 n.26 (C.D. Cal. Jan. 28, 2010) (noting, in

18  *Bivens* action, that "[e]ven if the shotgun was the fruit of an unlawful seizure, though, in

19  a civil proceeding like this one, there is no exclusionary rule which would bar the

20  Government from introducing it as evidence in a malicious prosecution lawsuit to

21  establish probable cause"); *Whitwell v. Hoyt*, No. 04-C-981-C, 2006 U.S. Dist. LEXIS

22  7283, at *11 (W.D. Wis. Feb. 27, 2006) ("[I]t would be unreasonable to permit [plaintiff]

23  to recover damages for his 'wrongful' arrest when the, undisputed facts conclusively

24  demonstrate that defendant . . . had probable cause in fact to arrest him."); *Ferrell v.*

25  *Bieker*, No. 1:03-CV-27-TS, 2006 U.S. Dist. LEXIS 7395, at *23 (N.D. Ind. Feb. 3,

26  2006) ("[T]he determination of whether the Defendants had probable cause to arrest the

27

28  ORDER – 21

Plaintiff can take account of evidence that may have been found as a result of a constitutional violation."); *Padilla v. Miller*, 143 F. Supp. 2d 479, 490-91 (M.D. Pa. 2001) (ruling that illegally seized evidence gave police probable cause to arrest plaintiff); *Reich v. Minnicus*, 886 F. Supp. 674, 681-83 (S.D. Ind. 1993) (declining to suppress evidence of plaintiff's consent to search obtained after unlawful entry).  If there is a case in which a court has applied the exclusionary rule to the benefit of a plaintiff in Mr. Smith's shoes, Mr. Smith has not cited it, and the court is not aware of it.

### 2.   Ninth Circuit Precedent Does Not Favor the Application of the Exclusionary Rule on Mr. Smith's Behalf.

Although the Ninth Circuit has yet to rule on the applicability of the exclusionary rule in a § 1983 case, it has declined to apply the rule in several civil contexts.  In *Grimes v. Commissioner*, it extended *Janis* to hold that the federal government could use evidence illegally seized by its own law enforcement agents in civil tax collection proceedings, unless the law enforcement agency and tax collection agency agreed in advance to share evidence.  82 F.3d 286, 290 (9th Cir. 1996).  Like the *Janis* Court, it considered the deterrent value of exclusion, concluding that because civil tax proceedings were beyond a law enforcement officers' primary zone of interest, application of the rule in the civil tax context was unlikely to deter violations.  *Id.*  The cost of enforcing the rule in that context was "readily measured in dollars and cents" lost from tax coffers.  *Id.*  The Ninth Circuit also recognizes the holding in *Lopez-Mendoza* that the exclusionary rule does not generally apply in civil deportation proceedings.  *Gonzalez-Rivera v. INS*, 22 F.3d 1441, 1448 (9th Cir. 1994).  It has also concluded that the exclusionary rule applies in civil forfeiture proceedings.  *United States v. $191,910 in U.S. Currency*, 16 F.3d 1051, 1063 (9th Cir. 1994) (noting that in "quasi-criminal" civil forfeiture proceedings, some of the "procedural rights afforded to criminal defendants" are applicable, including the exclusionary rule).  Not all circuits agree.  *See United States v. $493,850 in U.S. Currency*, 518 F.3d 1159, 1166 n.1 (9th Cir. 2008).

ORDER – 22

Considering Ninth Circuit authority on the use of the exclusionary rule in civil cases and the overwhelming weight of out-of-circuit authority on its use in § 1983 cases, the court concludes that the exclusionary rule does not apply to exclude the firearm Officer Kelly discovered during his illegal search of Mr. Smith.  There is little need for additional deterrence; Mr. Smith has already escaped criminal liability as a result of Officer Kelly's violation of the law.  To apply the rule here would add marginal deterrent value at the expense of depriving a jury of the truth in this civil case.  A jury who could not hear evidence of the firearm that Officer Kelly discovered would award damages based on the false impression that Mr. Smith was confined for months for jaywalking. The Ninth Circuit has never, so far as the court is aware, applied the exclusionary rule to permit a civil *plaintiff* to prevent relevant information from reaching the jury.  The concerns that the *Hector* and *Townes* courts articulated regarding the imposition of damages with little connection to the Fourth Amendment violation at issue are also persuasive.

Finally, the court considers the Ninth Circuit's willingness to apply the exclusionary rule in civil tax assessment actions or deportation proceedings where a government agent obtains evidence via an egregious or bad faith violation of a defendant's civil rights.  The Ninth Circuit recognized that exception in *Adamson v. Commissioner of Internal Revenue*, 745 F.2d 541, 545-46 (9th Cir. 1984), although it found no bad faith.  It applied that exception in *Gonzalez-Rivera*, where an egregious violation of the defendant's civil rights (a detention based solely on his race) led to evidence that he had entered the United States unlawfully.  22 F.3d at 1452.  The court mandated that the immigration court exclude the evidence.  *Id.*; *see also Orhorhaghe v. INS*, 38 F.3d 488, 505 (9th Cir. 1994) (excluding, from deportation proceeding, evidence obtained through bad faith violation of Fourth Amendment).  Although none of the parties cited this line of authority (which the court will refer to as the *Adamson/Gonzalez-*

ORDER – 23

*Rivera* exception), the court addresses it to ensure that its ruling today is consistent with Ninth Circuit precedent.

The court concludes that the Ninth Circuit would not apply the *Adamson*/*Gonzalez-Rivera* exception in a § 1983 case.[5]  First, that exception is grounded in a policy of protecting "judicial integrity" by preventing government agents from seeking civil sanction against a defendant based on the fruits of unlawful conduct. *Gonzalez-Rivera*, 22 F.3d at 1448-49.  That policy has substantial force in the tax assessment or deportation context, where the government, acting as a plaintiff, seeks a civil sanction.  It has less force, or perhaps none at all, when a plaintiff seeks to use the exception to impose liability (or additional damages) on a government defendant. Moreover, the standard for applying the *Adamson/Gonzalez-Rivera* exception appears essentially the same as the standard for denying qualified immunity.  Qualified immunity is not available to those who violate clearly established law.  The *Gonzalez-Rivera* court found that a bad faith constitutional violation "occurs when 'evidence is obtained by deliberate violations of the [F]ourth  [A]mendment, or by conduct a reasonable officer should have known is in violation of the Constitution.'"  *Gonzalez-Rivera*, 22 F.3d at 1449 (quoting *Adamson*, 745 F.2d at 545).  To apply *Gonzalez-Rivera* and *Adamson* to a § 1983 claim would lead to absurd results.  In this case, for example, the arrest of Mr. Smith after obtaining probable cause that he committed a firearm crime did not violate clearly established law, but the court could not make that determination if it excluded the evidence of the firearm.  The court concludes that the Ninth Circuit would not apply the

---

[5] At least five judges of the Ninth Circuit have concluded that *Gonzalez-Rivera* and its progeny were wrongly decided.  *Lopez-Rodriguez v. Holder*, 560 F.3d 1098 (9th Cir. 2009) (dissenting from denial of rehearing en banc).  They observe, among other things, that the *Adamson* panel erroneously characterized dicta in *Lopez-Mendoza* as part of a majority opinion.  *Lopez-Rodriguez*, 560 F.3d at 1099-1100 (citing four-justice plurality opinion in *Lopez-Mendoza*, 468 U.S. at 1050-51, and *Adamson*, 745 F.2d at 545-46).  The court considers the applicability of the *Adamson/Gonzalez-Rivera* exception because it remains the law of the Ninth Circuit.

ORDER – 24

*Adamson/Gonzales-Rivera* exception in a way that imposes civil liability on police

officers for lawful conduct.

**B.    Officer Kelly's Lawful Conduct, not His Unlawful Arrest and Search, Was the Legal Cause of Mr. Smith's Confinement.**

Although Mr. Smith cannot use the exclusionary rule to avoid the conclusion that

Officer Kelly had probable cause to arrest him for a firearm crime; he is nonetheless

entitled to those damages legally caused by Officer Kelly's unlawful initial arrest and

search.  For § 1983 plaintiff like Mr. Smith, damages principles of the common law of

torts are an "appropriate starting point."  *Cary v. Piphus*, 435 U.S. 247, 257-58 (1980).

Tort law provides a "set of rules to implement the principle that a person should be

compensated fairly for injuries caused by the violation of his legal rights," *id.* at 257,

although it does not provide damages rules for every species of § 1983 claim.  *Id.* at 258;

*see also Borunda v. Richmond*, 885 F.2d 1384, 1389 (9th Cir. 1988) ("A plaintiff who

establishes liability for deprivations of constitutional rights actionable under 42 U.S.C.

§ 1983 is entitled to recover compensatory damages for all injuries suffered as a

consequence of those deprivations.").  False arrest claims are among the § 1983 claims in

which "[t]he victim of [a] constitutional deprivation is entitled to compensation for

economic harm, pain and suffering, and mental and emotional distress that results from

the violations." *Borunda*, 885 F.2d at 1389.

Tort law causation rules typically allow a plaintiff to recover damages that are

reasonably foreseeable consequences of wrongful conduct.  Among the many limitations

on that general rule, however, is the notion that some intervening causes occurring after

the initial wrongful conduct are superseding causes that cut off liability.  *Townes*, 176

F.3d at 147 (citing *Restatement (2d) of Torts*, § 440); *Beck v. City of Upland*, 527 F.3d

853, 862 (9th Cir. 2008) (same).  The court queries whether the discovery of

incriminating evidence is a foreseeable consequence of a search for which officers lack

probable cause (or reasonable suspicion).  It seems incongruous, for example, that Mr.

ORDER – 25

Smith could argue that discovering a handgun was a foreseeable consequence of Officer Kelly's unlawful search, while arguing (successfully) that Officer Kelly did not have a reasonable suspicion that he was armed sufficient to justify frisking him.[6]  Ultimately, the court need not decide whether the discovery of the weapon (and the charges that followed) were foreseeable.  *Cf. Townes*, 176 F.3d at 146 ("It is arguable that [unlawful] searches and seizures could foreseeably cause the discovery of inculpatory evidence . . . .").

The *Townes* court, consistent with Ninth Circuit authority, ruled that the independent judgment of actors other than the defendant to continue pursuing a conviction was a superseding cause of the plaintiff's confinement.  In *Townes*, it was the "trial court's failure to suppress the evidence" that served as an intervening cause cutting off police liability to the plaintiff.  176 F.3d at 147.  Because the plaintiff in *Townes* was seeking liability only for his conviction and subsequent incarceration, *id.*, the court had no occasion to look for an earlier superseding cause.  It cited authority, including authority from the Ninth Circuit, holding that the independent judgment of a prosecutor to bring criminal charges is also a superseding cause cutting off police liability for the plaintiff's subsequent confinement.  *Id.* (citing, among other cases, *Smiddy v. Varney* ("*Smiddy I*"), 665 F.2d 261 (9th Cir. 1981)).  *Smiddy I* established a rebuttable presumption that a prosecutor's decision to bring criminal charges is a superseding cause of prosecution and confinement that follows that decision.  665 F.2d at 266-67.  That presumption, with many refinements, endures today in the Ninth Circuit.  *See*, *e.g.*, *Beck*, 527 F.3d at 862-63 (reviewing *Smiddy* presumption and methods of rebutting it).

---

[6] Mr. Smith misses the mark in his citation of *Stoot v. City of Everett*, 582 F.3d 910 (9th Cir. 2009).  There, the court ruled that the use of a confession by the prosecutor was foreseeable consequence of an unconstitutional interrogation of a suspect.  *Id.* at 926.  But unlike a suspicionless search, in which an officer will most often recover nothing of value, an officer eliciting a confession expects to obtain a confession to the crime about which he is inquiring.

ORDER – 26

Before considering the application of the *Smiddy* presumption to Mr. Smith's case, the court considers the *Townes* court's final rationale for barring the plaintiff from recovering damages resulting from his conviction and incarceration:

> [Plaintiff] is foreclosed from recovery for a second, independent reason: the injury he pleads (a violation of his Fourth Amendment right to be free from unreasonable searches and seizures) does not fit the damages he seeks (compensation for his conviction and incarceration).

176 F.3d at 147.  The court explained that although traditional tort principles were a starting point for determining § 1983 damages, considerations unique to § 1983 sometimes yield different results.  *Id.* at 148.  In the *Townes* court's view, the goal of the Supreme Court's "§ 1983 jurisprudence has been to tailor liability to fit the interests protected by the particular constitutional right in question."  *Id.* (citing *Cary*, 435 U.S. at 258-59).  The court observed a "gross disconnect" between the invasions of privacy that the Fourth Amendment protects and the harm of conviction and incarceration.  *Id.* ("The evil of an unreasonable search or seizure is that it invades privacy, not that it uncovers crime, which is no evil at all.").

By this final rationale, which the court concludes the Ninth Circuit would adopt, Officer Kelly's violations of the Fourth Amendment were not the legal cause of Mr. Smith's confinement.  Those violations – a false arrest and an illegal search – were unquestionably an invasion of Mr. Smith's privacy.  They were, however, brief.  Within minutes, Officer Kelly had probable cause to arrest Mr. Smith, and that arrest violated no law.  Like the *Townes* court, this court concludes that victims of illegal searches "cannot be compensated for injuries that result from the discovery of incriminating evidence and consequent criminal prosecution."  176 F.3d at 148; *Hector*, 235 at 157 (quoting *Townes*).  To explain why it is likely that the Ninth Circuit would reach the same conclusion, the court returns to the *Smiddy* presumption.

The *Smiddy* presumption is that the "[f]iling of a criminal complaint immunizes investigating officers . . . from damages suffered thereafter because it is presumed that

ORDER – 27

the prosecutor filing the complaint exercised independent judgment in determining that probable cause for an accused's arrest exists at that time." 665 F.2d at 267. A plaintiff can rebut the presumption in a variety of ways. *Id.* For example, a plaintiff can show that police pressured the prosecutor or supplied false information, that police acted maliciously or with reckless regard for the plaintiff's rights, or that the prosecutor relied on the police investigation without making an independent judgment. *Beck*, 527 F.3d at 862 & n.9; *Smiddy I*, 665 F.2d at 267; *Borunda*, 885 F.2d at 1390 (finding that "striking omissions in the police report" along with evidence that the prosecutor "had no information available to him other than that contained in the police report" sufficed to overcome presumption). The burden to rebut the presumption is on the plaintiff. *Smiddy v. Varney ("Smiddy II")*, 803 F.2d 1469, 1471 (9th Cir. 1986). In addition to rebutting the presumption of independent judgment, the plaintiff bears the burden of proving that probable cause did not support the prosecutor's charges. *Beck*, 527 F.3d at 865.

Mr. Smith cannot rebut the *Smiddy* presumption. To put that conclusion in context, the court briefly recounts what it knows of Mr. Smith's prosecution and confinement after his arrest. Officer Kelly took him to the King County Jail. Five days later, on February 4, a deputy of the King County Prosecutor charged Mr. Smith with unlawful possession of a firearm. Mr. Smith remained in King County jail until he made bail around March 10. Federal prosecution began on April 20, when a magistrate signed a felony complaint and issued a warrant to arrest Mr. Smith for being a felon in possession of a firearm. On April 23, the King County Prosecutor dismissed charges against Mr. Smith in order to cede jurisdiction to the federal government. Mr. Smith entered federal custody on April 21, and he remained in custody until the United States Attorney dismissed charges against him on August 21.

When the King County prosecutor brought charges, she had probable cause. She attached to her charging document the certification of probable cause that Officer

ORDER – 28

Ellithorpe signed on the day of Mr. Smith's arrest.  Morehead Decl. (Dkt. # 98), ¶ 2 & Ex. A.  That certification explains that Officer Kelly found a handgun when he searched Mr. Smith and that Mr. Smith was a felon.  The charging document shows that the prosecutor independently verified Mr. Smith's felony convictions.  In short, the prosecutor had probable cause for the firearm charge she brought.  That alone prevents Mr. Smith from rebutting the *Smiddy* presumption.  *Beck*, 527 F.3d at 865.

Mr. Smith points out that the probable cause certification includes statements that contradict the video evidence.  For example, Officer Ellithorpe declared that Mr. Smith "purposefully dallied in the street in an apparent effort to impede vehicle traffic," and that he "lingered in a southbound vehicle traffic lane and stared-down the driver of one car as though challenging the motorist."  Morehead Decl. (Dkt. # 98), ¶ 2 & Ex. A.  The prosecutor declared that she also reviewed the "police incident reports submitted with this case," but she did not include those reports[7] or cite them for any purpose other than clarifying that the arrest occurred on January 30.  *Id.*  The evidence reveals that the prosecutor did not have access to Officer Kelly's video when she brought charges.[8]

If the question before the court was whether the prosecutor exercised independent judgment in charging Mr. Smith with pedestrian interference, Mr. Smith would have rebutted the *Smiddy* presumption.  But the questions before the court are whether the prosecutor had probable cause to charge Mr. Smith with a firearm crime (a question the court has already answered in the affirmative) and whether there is any evidence that she did not exercise independent judgment in bringing that charge.  No matter how one

_____

[7] Both officers' arrest reports are in the record, Kelly Decl. (Dkt. # 76), Ex. A; Ellithorpe Decl. (Dkt. # 77), Ex. A.  Officer Ellithorpe's report repeats the critical statements of his probable cause certification essentially verbatim.  Officer Kelly's report makes similar statements.  Kelly Decl. (Dkt. # 76), Ex. A ("SMITH actually stopped walking in the southbound lanes of Rainier Av S and appeared to stare down the driver of a southbound vehicle that had stopped for him.").

[8] SPD Detective Timothy DeVore forwarded the charging information to the prosecutor, but did not forward the video.  DeVore Decl. (Dkt. # 97) ¶¶ 2-3.  He received the prosecutor's request for the video on February 3, but did not mail the video until February 17.  *Id.* ¶¶ 3-4 & Ex. A.

ORDER – 29

characterizes the officers' statements about Mr. Smith's walk across Rainier Avenue, there was nothing materially misleading about their statements that Mr. Smith was a felon carrying a firearm.[9]

Mr. Smith's circumstances illustrate the application of the Ninth Circuit's requirement that a plaintiff prove that a prosecutor lacked probable cause before he can rebut the *Smiddy* presumption.  The Ninth Circuit has not couched that requirement in the terms that the *Townes* court used – terms that require damages from a Fourth Amendment violation to fit the privacy interests that the Amendment protects.  Nonetheless, the requirement recognizes that a detention based on probable cause is no basis for damages, a requirement that implicitly vindicates the *Townes* approach.  In cases where a plaintiff has successfully rebutted the *Smiddy* presumption to obtain damages after a prosecutor files charges, not only is there no probable cause for the charge, the defendant has done something beyond the original constitutional tort to ensure that the prosecutor makes no independent judgment about the lack of probable cause.  *See*, *e.g.*, *Borunda*, 885 F.2d at 1390 (permitting plaintiff who rebutted presumption to recover cost of criminal defense as damages); *Awadby v. City of Adelanto*, 368 F.3d 1062,1067 (9th Cir. 2004) (reversing dismissal of § 1983 claim after concluding that plaintiff rebutted *Smiddy* presumption).  A plaintiff who succeeds in rebutting the *Smiddy* presumption does so because he moves beyond the original violation of his constitutional rights and demonstrates that officers committed a new wrong by causing a prosecutor to pursue charges that she would not

---

[9] The officers' statements contradicting the video evidence raise questions about whether the prosecutor would have pursued the firearm charge if she had known that the firearm was the fruit of an illegal search.  The court has no idea when a prosecutor first viewed the video.  Plainly the federal prosecutor viewed it at some point before the suppression hearing and decided to pursue charges nonetheless.  Perhaps the prosecutor believed that the video established probable cause for the initial arrest.  Perhaps the prosecutor believed otherwise and pursued charges nonetheless.  In any event, the Fourth Amendment does not prohibit a prosecutor from bringing charges that depend on unlawfully seized evidence.  Indeed, the Supreme Court in *Calandra* recognized that prosecutors may use unlawfully obtained evidence to secure indictments from a grand jury.  414 U.S. at 354-55.  This case does not call on the court to express a view on whether it is ethical for a prosecutor to pursue a charge that depends on illegally seized evidence.

ORDER – 30

have pursued in an exercise of informed and independent judgment.  That wrong, akin to malicious prosecution, continues the chain of causation that began with the initial constitutional wrong.  By contrast, a plaintiff who fails to rebut the presumption can obtain damages for only for confinement (without probable cause) before the prosecutor brought charges.  *Smiddy II*, 803 F.2d at 1473.  The prosecutor had probable cause to charge Mr. Smith with unlawful possession of a firearm, and nothing impeded her independent judgment in reaching that conclusion.

The R&R looks to the prosecutor's determination of probable cause to cut off Mr. Smith's right to damages, but the court finds no reason not look earlier, to Officer Kelly's probable cause to arrest Mr. Smith for the same crime.  *See*, *e.g.*, *Townes*, 176 F.3d at 149 (finding that probable cause to arrest based on illegally seized evidence were fatal to any claim for "damages for [plaintiff's] arrest and pre-arraignment detention").  Officer Kelly had probable cause to detain Mr. Smith as soon as he discovered he was a felon in possession of a firearm.  Mr. Smith cannot win damages flowing from that detention.

## V.   OFFICER KELLY'S LAWFUL-BUT-REPREHENSIBLE CONDUCT

Although it has nothing at all to do with his liability, the court cannot allow Officer Kelly's treatment of Mr. Smith to go unmentioned.  When Officer Kelly first accosted Mr. Smith, he had done nothing more egregious than jaywalking.  Even if Officer Kelly's conclusion that he had committed pedestrian interference were arguably correct, there can be no argument that Officer Kelly's approach to arresting Mr. Smith was reprehensible.  That approach was as follows:

| | |
|---|---|
| Officer Kelly: | Come here. |
| | (*Patrol car door closes immediately; at most three seconds pass.*) |
| Officer Kelly: | Fucking asshole.  When I tell you to fucking get over here, get the fuck over here.  I'm going to be fucking cool with you and then what the fuck?  He starts walking away from me.  What the hell are you doing? |

ORDER – 31

What Mr. Smith was doing, apparently, was violating Officer Kelly's personal rule against not responding in three seconds or fewer to police commands. What Officer Kelly was doing was engendering disrespect for law enforcement and, by extension, the criminal justice system. This court plays a role in that system, but each citizen's experience in that system typically begins with the conduct of an officer on the street. The public counts on everyone with a role in that system to act in a manner that brings the justice system credit. When an officer verbally abuses a suspect for no reason whatsoever, he discredits everyone in the system. The court recognizes that officers on the street sometimes confront circumstances in which language that would otherwise be abusive is either appropriate or understandable. The circumstances that confronted Officer Kelly do not remotely qualify. Officer Kelly may believe that aggressive, abusive, or foul language is a necessary component of good law enforcement. If so, he is profoundly mistaken. His conduct promotes disrespect and disdain for every police officer, even those who treat suspects with respect, integrity, and professionalism. The court is not in the habit of addressing conduct that does not bear on the liability of the parties before it, but it would be a disservice to the justice system to permit Officer Kelly's conduct to pass without mention.

## VI. CONCLUSION

For the reasons stated above, the court ADOPTS much of the R&R (Dkt. # 91), DENIES Mr. Smith's objection (Dkt. # 92) and DENIES Officer Kelly's objection (Dkt. # 93). Officer Kelly is liable as a matter of law for his initial unlawful arrest and the search that followed. Mr. Smith is entitled to the damages flowing from that arrest[10] and

---

[10] Officer Kelly contends that Mr. Smith is entitled to no damages flowing from his arrest because he was entitled, even without probable cause to suspect him of any crime, to detain him to issue a jaywalking citation. A detention for purposes of issuing a citation is a lesser intrusion than a full-blown arrest, and a jury is entitled to determine to what extent the difference warrants a damage award.

ORDER – 32

search, but those damages do not, as a matter of law, include any confinement following Officer Kelly's discovery that he was a felon in possession of a handgun.

Mr. Smith is entitled to a trial to determine his damages.  The court orders the parties to meet and confer to prepare a joint statement addressing when they will be prepared for trial and whether they consent to conduct the trial before Judge Donohue. The parties shall submit the joint statement no later than November 7, 2013.

DATED this 24th day of October, 2013.

*Richard A Jones*
_____
The Honorable Richard A. Jones
United States District Court Judge

ORDER – 33